Please rise, the Honorable Judges of the United States of America. Court is now in session. God save the United States and this honorable court. Please be seated. Morning. Our first case is number 23 dash 1680 Abigail P. through her parents Sarah F. against the Old Ford School District. Good morning. May it please the court. I'm Jacqueline Lembeck. I'm here on behalf of the appellants Abigail P. and her mother Sarah F. who's here with us today, as well as arguing on behalf of our amicus partners, the Education Law Center, the Arc of Pennsylvania, the Arc Alliance, and the ACLU of Pennsylvania. And I'd like to reserve five minutes for rebuttal. Thank you, Your Honor. Abigail is a student with some of the most significant disabilities within the Old Ford School District, and she was entitled to the same free, appropriate public education or FAPE that she always had been during the 2020-2021 school year. Could I ask you this? The district court found that the students' parents participated in the IEP process and agreed with the changes that were made in the December 2020 IEP meeting. How important is that? Doesn't that require us to give some additional deference here? Your Honor, no, because the decision to move to virtual was made before that, and the student's mother had already asked in written correspondence, which is part of the record, for the student and her class to be permitted to have in-person instruction because the family felt that that's what she needed. When the meeting was convened partway through the period of virtual instruction, it was just to formalize the decision that had already been communicated to our client that virtual instruction was the only thing that could be offered. So to the extent that she may have agreed that, for example, a goal relating to transitions was not something that could be monitored in the virtual instruction program does not mean that she actually agreed with the change to go to the virtual instruction program in the first place. But how did the school district know that she didn't agree with the December IEP? The district needs to issue its Notice of Recommended Educational Placement. That document didn't get issued until months later. They knew that she didn't agree with the move to virtual because she had contacted in November the district's director of special education and asked for in-person, and then she further contacted both the superintendent and, in fact, even the school board to ask for in-person instruction for Abigail. When was that? The conversations with the superintendent and the school board came about in January of 2021, particularly because at that point the family had... After the December IEP? That was December 2020, right? Correct. And the reason that the conversation was renewed at that point is because that is when the family realized that the district was making an exception for varsity basketball to compete and practice in home and away games in person. All right, but does that mean then that if the basketball team hadn't been accommodated that the IEP would have been okay? No, it does not. Well, then the basketball, how they treated the basketball team had no relationship then to whether she was given a FAPE or not. It's a separate issue. The reason why the basketball team is significant are two things. One, I imagine in a few moments' time the other side is going to tell you that this was happening in the context of a deadly public health crisis and they had to make these decisions. Clearly, they knew that they could make exceptions, and they did make exceptions when they felt it was weighty enough. The district seemed to feel it was weighty enough because some varsity athletes might not be able to participate in playoffs. They did not feel it was weighty enough to grant in-person instruction that they agreed she needed. The district's director of special education testified that she agrees that Abby needs a full day of in-person instruction. They didn't feel that it was weighty enough to provide Abigail the FAPE that she needed, and the law had never changed. Well, I think you're on strong footing there. The law, I think, is pretty clear that a FAPE must be given to the student regardless, even if it's a pandemic. Correct, Your Honor. But what they're doing with the basketball team, hurting them, helping them, accommodating them doesn't, I don't think, shed any light on whether this student got a FAPE or not. I think this court needs to apply its traditional standard of FAPE and look at the facts here of the program. I totally agree with that. I believe that the facts relating to the basketball team undermine the district's argument and also undermines the hearing officer's rationale. So if we go back to the administrative hearing officer's decision, what the family has argued is that he relaxed the standard of FAPE because his analysis centered around reminding that he was making this determination in the context of the pandemic and the need to, you know, account for the student's safety. We have never disputed that. We've never argued that virtual instruction is a per se violation. What we've argued is that for Abigail, because she functions in the 0.1 percentile, she's a non-verbal learner, and she also has very significant self-injurious behaviors that could not be met in this truncated virtual program that she received. Well, the standard is whether it's reasonably calculated to provide adequate education under her circumstances. But the parent was arguing that all children should be in person rather than virtual. That doesn't really focus on what Abigail needs, does it? The parent asked for Abigail's class of five, five students, Abigail's one of five, to be brought back in person specifically. But to your point about, Judge Rundell, about the standard, it's clear that the district never recommended virtual instruction because they felt it was reasonably calculated to address Abigail's specific needs. When the district received the results of the evaluations from the previous school year, the independent neuropsychological evaluation and the independent speech and language evaluation, the IEP team developed a program it felt was appropriate. That was an in-person full school day program. The only reason. But looking at the second marking period and the letter matching and all the things that she did, it shows progress. It shows progress. I mean, wouldn't you think that if it wasn't reasonably calculated that there would be some problems? But it seems like she did quite well, and the witnesses, both Hopkins and McLean, said that they were able to provide her with instruction. I don't see where the content fell short. You seem to be complaining of the manner, and the hearing officer said that. You're really complaining of the manner. But where did the content fall short? Sure. Judge Rundell, I'd like to address both the progress and the programming. So the progress actually does not show that she made progress. So on that number goal, the goal was reduced, and Abigail, that second marking period, was only asked to perform number matching, which the teacher testified is a lesser skill. So when you test a student on a lesser skill that that student already has, yes, the scores may show that the student has that skill. We would hope it shows that the student has that skill. What it doesn't show us is if she can do letter identification, which is what her actual ambitious goal under Andrew F. was. In addition, her letter matching goal showed, and the district's IEP says this, inconsistent progress for the second marking period. Her speech goals, one of them showed that she did not make progress. She was not copying as many sounds in the second marking period. And the other one doesn't actually report data in a way that could be compared. So the scores needed to be reported in percentage accuracy, and they were reported like that beforehand. For the second marking period, there was no percentage accuracy reported, and the reason for that is very clear. The teacher testified that during virtual instruction, it's very difficult to see what Abigail was doing, because she doesn't necessarily stay in one place, and because she needs a full hierarchy of prompting, meaning that sometimes she needs hand over hand, someone to literally take her hand and place it on what she needs to be doing. She had the nurse and the behavioral technician there. You had two people with her, did you not? The behavior tech was not provided by the school district and not trained in the delivery of educational programming. And the nurse is provided only for Abigail's epilepsy and medical needs, again, not trained in the provision of educational programming. All right. Let's assume, I know you've argued the IEP was insufficient to provide a FAPE, right? That's your first argument. We've argued that the program delivered to her during this period of time was insufficient, yes. All right. Let's assume the program as designed was sufficient. What's your best argument as to it not being implemented properly or as written? Absolutely. The best one is that the teacher admitted that none of Abigail's behavioral specially designed instruction were in place for the entire period of virtual learning. She's a student who has significant self-injurious behaviors,  So if you have a student where we know that she needs behavioral support, we take away those supports for this period of months, and then she regresses. That's clearly foreseeable, and it's not reasonably calculated. So the failure of implementation was the removal of behavioral supports? That is one of the most clear. But then there's also her academic day, which was a six-hour and five-minute day beforehand, got truncated down to an hour and ten minutes a day of instruction, only 15 minutes a day of math and 15 minutes a day of reading. And that is all she received for academic and behavioral instruction, and then she received some amount of her related services, not even the whole. If she got the whole, it would be three and a half hours a week. But wasn't it the parent that said that she regressed? The district court said that MacLaine said that. But in truth, I think her parent said she regressed, but there's no witnesses that said that she regressed during this time. The special education teacher said that behaviorally, she did not return back to her previous behavioral levels until the end of the school year. She also said that when she returned to in-person instruction in February, that they had to go back to previously worked on concepts. Well, the school district offered compensatory education, but the parent opted to send her to summer camp instead. Isn't that correct? The school district made a very late offer of COVID compensatory services, which were only for related services, so only for speech, occupational therapy, and physical therapy. It was in a number that even the witnesses at the hearing did not know how much it would be. They thought maybe an hour and a half for each ESY or extended school year day. That's only about 20 days over the summer. So to replace 53 full days of instruction just with a few hours only for related services, that don't even touch upon her academics or behavior was clearly insufficient. And it was made so late in the game that Abigail's family had to make a plan as to where she would spend her summer, and they chose a behavioral camp for students with disabilities. Your Honor, I see my time is up. You've got five minutes for rebuttal. Thank you very much, Ms. Lundberg. Mr. Specht. Good morning, Your Honors. My name is Thomas Specht. I'm from Marshall-Dennehy, and I represent the Old Forge School District. We respectfully request that the March 2023 order of the district court be affirmed. From your questioning, it seems like the court very well understands the issues in this case, but the first issue I wanted to address was the standard of review. The appellant has argued that the standard was misapplied, the FAPE standard was misapplied. I really don't think that's the case here. I think it's just an attempt to get plenary review from this court, you know, to find an error. But when you look at the AHO's opinion, clearly he sets forth in the first three paragraphs of his conclusions of law the FAPE standard. He understood that, you know, you had to analyze whether an IEP is reasonably calculated to enable the child to make appropriate progress in light of the child's circumstances. He understood that the IEP must be reasonable, not ideal. He understood that the appropriateness must be determined at the time it was made. Both the district officer and the district court cite to the deadly health crisis, and they use those terms. How does that factor into the equation here? Your Honor, I would say that that factors into the equation in that you have to look to the circumstances. You have to look at the child's circumstances. Right. And I think, you know, it's reasonable to look to the world that that child is in, the world that that child is facing in determining whether or not they've received the FAPE. You know, to make decisions about the special education without looking at COVID-19 and the impact of COVID-19 doesn't seem to be reasonable. I mean, there are health concerns here, not only for the teachers and the employees and the staff and the other students, but for the student herself. I think that's one of the circumstances that can be considered. What's your best case for that proposition? I would say that there's a, you know, the Ridley case from this court talks about, in a general fashion, obviously nobody anticipated a pandemic here. They talk about that they have to be able to meet the student's needs and have flexibility to balance disabled students' needs with financial and administrative concerns. I would think administrative concerns play into, you know, could conceivably play into a pandemic, again, that nobody anticipated. I think, you know, the Andrew case, excuse me, the Andrew case from the U.S. Supreme Court, just the language of circumstances I think is general enough to encompass, you know. But that might give some leeway to the school district about how the IEP is implemented. Correct. But the IEP still has to be established in such a way as to provide a FAPE, regardless of the externalities, including a pandemic, no? Absolutely, Your Honor, absolutely. So Judge Sirica had asked your friend on the other side about the agreement to the modification of the IEP in December after transition had been made to virtual instruction. And Ms. Lembeck responded that, I think, she can correct me if I'm wrong, but I think she responded that they didn't really agree to that IEP in December. They were still objecting. What's your response to that? They, in fairness, in looking at the record, Your Honor, she did send a letter, you know, as Judge Rendell was correct, it was regarding the whole class, regarding the entire student class. Can you please keep it virtual? Keep it virtual? I'm sorry, keep it in person, not keep it virtual. But, you know, and I think the superintendent or it might have been the director of special education responded that, you know, we're acting based on guidance from the Pennsylvania Department of Education and the Department of Health. The Lackawanna County is in substantial transmission. I think it was 20 to 48 percent transmission. And, you know, and I think even the mother responded in her letter, you know, stay safe. I mean, she didn't want it to go to virtual in fairness. But, you know, I think that was a circumstance. The pandemic was a circumstance that they could consider in determining whether or not to provide virtual in-person education to. And when was that letter sent? I think it might have been sent, to be honest, Your Honor, I can't remember. But I think it was close in time to when after they went, you know, they said they were going to go virtual sometime. And it might have been December, Your Honor. I'm just trying to be fair here, you know, with regard to the record. But when the meeting occurred to modify the IEP in December, was any objection lodged? No, I think it's even noted at a few places in the IEP that the parent, you know, there were no objections to the mode of instruction other than, I think, that it was virtual. But they were basing that on, you know, recommendations from the independent educational exam that had been performed on the student at the parent's request, where they indicated that she could use, you know, assistive technology, and she liked to do that. She even had worked on that prior to going virtual. The teacher had tried to get her to get used to doing that because they anticipated that this might happen, that, you know, that they might have to go virtual eventually because of the dangers, you know, resulting from the pandemic and trying to keep people safe. You know, so she had been working on that. I think even there's testimony from her teacher that she liked to work on it with, you know, the iPads and the assistive technology such as, you know, the boom cards that they provided and things of that nature. Several of our sister circuit courts have held that a school district has to materially fail to implement an IEP in order to deny a FAPE under the IDEA. Is it your argument here that the school district didn't perfectly implement the IEP, but you're not liable because it wasn't, while not perfect, it was not materially lacking, or is it your argument that you complied strictly with the letter of the IEP or some other argument? Well, it's a little bit of both. I'd say some other argument in that, you know, you're really not permitted to use 20-20 hindsight looking back. It's just strictly at the time it was made, the IEP was made, and at that time, you know. Well, that's the legitimacy of the IEP as written. It doesn't speak to implementation. I'm sorry. With regard to that, I would say that, you know, nothing is implemented perfectly, obviously. This is, you know, reality. We're dealing with a difficult situation here where we're trying to instruct virtually. But, you know, the facts show that she made progress in numerous, numerous areas. And I think what the case law has required is that, you know, if you're seeing only, if you're seeing no progress, de minimis progress and the parents complaining and they're showing you this isn't working, that's not working, then maybe you might have an obligation to do something at that time. But that's not what happened here. What happened here is she was making progress. The teacher said she was making progress. The special education director thought she was making progress. I think even her IEP, you know, it's noted in her IEP that she made progress in number identification, letter matching, emotion identification, decreasing problem behaviors, pictures and objects, speech and language therapy, occupational therapy, physical therapy, and adaptive physical education. The parent even agreed that speech therapy was great for her. She was getting the full amount of that. She was getting, you know, a lot of supports. They had given her stuff to take home with her to practice with, even if she wasn't getting as much one-on-one education as she would have liked. What's your response to the argument that we heard that the hours went from six hours a day down to an hour and a half a day? I mean, it went down to, it did go down. That's correct. You know, that's honestly what happens in virtual instruction. You know, with virtual instruction, even for, you know, anecdotally, my own kids, it wasn't as much. It's just that's the way it works. But that's why I think they gave her the stuff to practice on, you know, the boom cards, the bulletin board letters, all that sort of stuff that's referenced in the record. She was recognized as needing extended school year services, I think. Even before all this happened, they were probably anticipating that she was going to take advantage of that. I'm not sure if she did. And then they offered compensatory COVID services for the occupational therapy, physical therapy, things of that nature. Because I think what happened was... Would it have been a denial of a FAPE had they not offered that compensatory services? I think that it's possible that it could have been if she wasn't getting as much as she wanted. And I think there's case law out there that says where it is offered and it's refused. And I think we cite it in our brief that that's complying with FAPE. They offered it to many, many, many kids in the school. And it just wasn't taken advantage of by the appellant. What deference do we owe to the Department of Public Health's question and answer on providing services to children with disabilities? Do we owe any deference? Does that figure in here at all? Well, I think as an expert administrative branch of the government, you should give it some deference. But obviously the case law is that even though they said there's no barrier to virtual education, you still have to provide a FAPE. That's the number one thing that this court has to be guided by. Your Honor, school districts just insist on virtual education going forward for Abby or for any other student who's on an IEP? No, I don't think they can. I think it would have to be a situation like this where the circumstances of the world and of her surrounding circumstances present something like this where it would be a danger to not only her, but to the teachers, to the other students, for people to be cooped up in a classroom for eight hours a day, which it was. Did you contend in front of the agency that it would be inappropriate to subject this student and perhaps other students to the risks of COVID infection? Your Honor, I believe we argued that it could consider the pandemic. I'm not sure exactly what my co-counsel said with regard to that subject. But I know that they did indicate that that was a circumstance that could be considered in crafting the IEP and that sort of thing. Your Honor, I think you've definitely hit all the issues. And unless the court has any more questions, I would relinquish the remainder of my time. Judge Rendell, anything further? No, thank you. Thank you, Mr. Speck. We'll hear rebuttal from Ms. Lembeck. Thank you, Your Honor. Ms. Lembeck, let me ask you a question. If they had gone back to in-person and Abby had contracted COVID and was put on a ventilator, wouldn't you argue that they weren't taking her safety into account, which is a clear circumstance of a child? Isn't the safety of the student something that's part of the circumstance? Your Honor, I think that that's something that families could consider. Certainly, the families of the varsity basketball players were considering whether they wanted to send their child in or not. Abigail's mother is a nurse, and she could see in her correspondence that she said she takes this very seriously. But on the whole, who will have the obligation to consider? FAPE says in light of the child's circumstances, the circumstances where there's a very great risk to the health of these children. And if something had happened, would you then argue that their FAPE failed to take that into account? No, Your Honor. I think FAPE is looking at the circumstances of providing the child their education. And remember, this is not the early days of the pandemic where there was a state-mandated closure and no one had yet really developed the techniques to be able to safely educate. This was after schools had, by and large, opened. And there was funding to school districts from the federal government to enhance ventilation. And there were guidelines about how to spread out students. There were many things that could have been put in place. Abigail's classroom could have been, you know, her classroom or five or just herself with in-person instruction. And by all means, the school district felt that it was appropriate for her to have a nurse in the home. So there's a level of risk that the school district was certainly willing to tolerate, that the family felt was absolutely necessary to tolerate for her to receive her education. Because any bit that sets Abigail back is so significant to her based on her cognitive functioning in the 0.1 percentile. And, you know, I do want to address what the, you know, continued risk of a decision that says that this was a FAPE could be. And you could see that in the amicus brief that was submitted. The virtual instruction may have been launched by the pandemic, but it is here to stay. Schools are permitted to use up to five flexible instruction days where they do not need to provide in-person learning. We can address those on a case-by-case basis as to whether each student gets a FAPE, right? Absolutely. We don't have to write an opinion in this case, regardless of which way we rule, that is going to blast virtual instruction. Agreed, Your Honor. However, if this program was a FAPE, then Abby could receive it tomorrow, and it would still be a FAPE. And that's what we feel is completely inappropriate. Well, it would depend. Let me follow up on Judge Rendell's question, because let's start from the premise that the pandemic is not an excuse to deny someone a FAPE, okay? The FAPE must be provided regardless of the externalities, including the pandemic. But in terms of how the FAPE is implemented, isn't that a totality of the circumstances evaluation, the totality of the circumstances of the child's situation, the world's situation, the school's situation? And those circumstances include the fact that there was a pandemic. So doesn't it sort of have at least an orthogonal or a tangential impact on this case, even if it doesn't drive the case? Or is it your argument that it's just entirely irrelevant and not to be considered at all? It's only because of Abigail's particular needs. So virtual instruction might be an appropriate modality based on the circumstances for a student who can access it. But Abigail, based on her needs, could not. And the testimony was very clear that the director of special education agreed that she absolutely, that's a quote, needs in-person instruction. Well, I'm not sure. I appreciate that, but I'm not sure you answered my question. My question was, is the pandemic or any other health crisis and the potential impact upon the students, the teachers, et cetera, is that at least a consideration in terms of how an IEP is implemented? Or is it something that can't be considered? So the guidance that we have from the Department of Education says that schools were able to consider and use alternative modalities when a student could be provided FAPE. So the first analysis is whether the student could be provided FAPE. And then the second then would be what modalities can be used in those alternative circumstances. All right. But can the pandemic, can a public health crisis be considered as one of the individual circumstances in terms of us or the agency evaluating the implementation of the FAPE, excuse me, the implementation of the IEP? I guess I would say as long as it does not relax the FAPE standard because Congress didn't choose to do so. Perfect. Thank you. Thank you, Your Honor. Thank you very much, Ms. Lindbeck. Thank you, Mr. Specht. Court will take the matter under advisement. Thank you.